2002 UT 52

**C. Dean and Carol N. HERMANSEN, Richard and Carol Abelhouzen, Plaintiffs and Appellants,**

v.

**George N. TASULIS, an individual dba Interchange Real Estate, Tarena McDougal, Stanley R. McDougal, an individual dba Stan McDougal Construction, McDougal–Shaw Developers, a Utah limited liability company, Duane Shaw, an individual, Scott Claffey, an individual, Mansell & Associates, a Utah corporation, and John Does 1–25, Defendants and Appellees.**

No. 990851.

Supreme Court of Utah.

May 17, 2002.

---

236

Lincoln W. Hobbs, Akiko Kawamura, Salt Lake City, for appellants.

Roger R. Fairbanks, Salt Lake City, for appellees.

HOWE, Justice.

## INTRODUCTION

¶ 1 Plaintiffs, home owners, appeal from an order granting a motion for summary judgment to defendants, a real estate broker and his agent, who were involved in the sale of real estate to plaintiffs.

## BACKGROUND

¶ 2 On May 2, 1994, plaintiffs C. Dean and Carol N. Hermansen entered into an earnest money sales agreement with Stanley McDougal, a licensed contractor, to construct a home on lots located within the Wasatch Downs Subdivision which were owned by McDougal Shaw Development, LLC.

¶ 3 Stanley McDougal is a part owner of McDougal Shaw Development. Stanley's wife, Terena McDougal, is a licensed real estate agent who worked for George Tasulis, d.b.a. Interchange Real Estate, a licensed real estate broker. When the Hermansens executed the earnest money sales agreement, Tasulis and Terena were engaged by McDougal Shaw Development to act as listing broker and agent, respectively. The Hermansens assert that in their conversations with Tasulis, he implied to them that he was acting in their best interests and representing them in the real estate transaction.[1]

¶ 4 The Hermansens are the only plaintiffs who are parties to this appeal. Their claims against Stanley and Terena McDougal, as individuals, have been resolved in a partial settlement agreement. In this appeal, the

---

1. Although the Hermansens indicate in their brief that Tasulis represented he was acting in the Hermansens' best interest, it is unclear whether they employed their own real estate agent.

Hermansens seek reversal of a summary judgment dismissing their claims against Tasulis. Terena remains a party to the suit only by virtue of her agency relationship with Tasulis.

¶ 5 The Hermansens allege that at some point prior to April 30, 1994, Terena, Stanley, and Tasulis became aware, or through the exercise of reasonable diligence should have been aware, of significant problems with the stability of the soil and subsurface conditions at the subdivision. Surface water would accumulate in one area of the subdivision, and in preparing the property for development of residential construction, a backhoe was stuck for several days in a mud bog. They further assert that Stanley was also aware that the previous owner of the property kept livestock that occasionally would mire down in the mud and have to be pulled out by horses. Stanley installed a subdrainage system to prepare the property for construction. Despite the installation of the subdrainage system, the unstable soil conditions resulted in some parts of the Hermansens' home settling 3.75 inches, causing substantial structural damage.[2]

¶ 6 Terena was a guarantor on the purchase of the property which became Wasatch Downs Subdivision. The record indicates that Terena and Tasulis occupied a trailer office located within the subdivision and that Tasulis was in the trailer the day a backhoe got stuck in what was described as "chocolate pudding-like mud." Deposition testimony revealed that it took two to three days of work with three to four pieces of heavy machinery to extricate the backhoe. The Hermansens assert that Tasulis and Terena knew that the lots purchased by the Hermansens were unsuitable for residential construction, but neither of them disclosed this information to the Hermansens.

¶ 7 Stanley McDougal was questioned in deposition whether he had discussed his decision to purchase the subdivision property with his wife, Terena. He acknowledged that these conversations had taken place. However, on advice of counsel, Stanley asserted the spousal privilege and refused to answer questions about whether Terena and he discussed surface water that Stanley had observed on the property. Stanley's counsel indicated that he would advise Stanley not to answer any other questions respecting any conversation between Stanley and Terena relating to the existence or nonexistence of surface water within the subdivision. Stanley did, however, admit that Terena did not actively seek to sell real estate other than properties in which he had an ownership interest and that a significant portion of the real estate that Terena sold was real estate owned by him.

¶ 8 The Hermansens assert that under Utah law, because real estate professionals hired by a vendor are expected to be honest, ethical, and competent, and are answerable at law for their statutory duty to the public, Tasulis and Terena each breached that duty when they failed to disclose material defects in the property. The Hermansens further allege that Terena and Tasulis knew or should have known of the unstable condition of the soil at the subdivision upon which Stanley was building the Hermansens' future home and that Stanley, Terena, and Tasulis worked to fraudulently represent that the property was suitable for residential construction.

¶ 9 The trial court dismissed plaintiffs' negligence claim against Tasulis and Terena based on its interpretation of *American Towers Owners Ass'n v. CCI Mechanical, Inc.*, 930 P.2d 1182 (Utah 1996), which the trial court concluded precluded claims for economic loss arising from nonintentional torts. The court also dismissed plaintiffs' claim of fraud, finding insufficient evidence to support that claim.

## ANALYSIS

¶ 10 We review the trial court's summary judgment for correctness, considering only whether the trial court correctly applied the law and correctly concluded that no disputed issues of material fact existed. *See, e.g.,*

---

2. A civil engineer deposed by the plaintiffs testified that it is normal for a home to settle up to one inch.

*Surety Underwriters v. E & C Trucking,* 2000 UT 71, ¶ 14, 10 P.3d 338. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* When we review a grant of summary judgment, "we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party." *Id.* at ¶ 15.

## I. APPLICABILITY OF *AMERICAN TOWERS*

¶ 11 The trial court relied heavily on *American Towers* in entering summary judgment for defendants on the Hermansens' claims of negligence and breach of fiduciary duty, applying the economic loss doctrine to bar these claims. 930 P.2d 1182, 1184 (Utah 1996). The plaintiff in *American Towers* sought damages for losses incurred as a result of alleged faulty design and construction in the plumbing and electrical systems of a large condominium complex. *Id.* The plaintiff, however, "was not a direct party to any of the construction contracts with defendants and . . . there was no express language in the contracts establishing an intent to confer a special benefit on the [plaintiff]." *Id.* at 1187. Thus the success of the plaintiff's action in that case was dependent upon whether it was an intended third-party beneficiary.

¶ 12 As we noted in *Oxendine v. Overturf,* "the predominant inquiry in any third-party beneficiary case is whether the contracting parties clearly intended the third party to receive a separate and distinct benefit from the contract." 1999 UT 4, ¶ 14, 973 P.2d 417 (citing *Am. Towers,* 930 P.2d at 1188). In the present case, we are not faced with a third-party beneficiary scenario. Rather, the two remaining parties to this suit, the Hermansens and the real estate broker and his agent, dealt directly with one another. Therefore, the issue becomes whether any duties or contractual relationship existed, the breach of which would entitle the Hermansens to a remedy.

## II. ECONOMIC LOSS RULE

¶ 13 The trial judge determined that the economic loss rule articulated in *American Towers* precluded suit against Tasulis and Terena for nonintentional torts. In the recent case of *SME Industries, Inc. v. Thompson, Ventulett & Associates, Inc.,* we traced the product liability roots of the economic loss rule articulated in *American Towers,* and reiterated its application to limit certain types of claims, stating:

> The economic loss rule is a judicially created doctrine that marks the fundamental boundary between contract law, which protects expectancy interests created through agreement between the parties, and tort law, which protects individuals and their property from physical harm by imposing a duty of reasonable care.

*SME Indus., Inc.,* 2001 UT 54, ¶ 32, 28 P.3d 669 (citing *Am. Towers,* 930 P.2d at 1190). We also noted that although the economic loss rule has its roots in limiting damages in products liability cases where there is no physical injury, "the rationales underlying the doctrine are particularly applicable in the construction setting." *SME Indus., Inc.,* 2001 UT 54 at ¶ 35, 28 P.3d 669. While not solely limited to a construction setting, we wrote that " '[c]onstruction projects are characterized by detailed and comprehensive contracts that form the foundation of the industry's operations.' " *Id.* (quoting *Am. Towers,* 930 P.2d at 1190). We also noted:

> [I]n *American Towers* . . . relief for defeated economic expectations under a design or construction contract was to come from the contract itself, not from third parties. We reasoned that to conclude otherwise would essentially impose the plaintiffs' "economic expectations upon parties whom the [plaintiffs] did not know and with whom they did not deal and upon contracts to which they were not a party."

*Id.* (quoting *Am. Towers,* 930 P.2d at 1192) (alteration in the original) (citation omitted).

¶ 14 In the present case, the Hermansens assert that both Tasulis and Terena breached their duties to disclose potential problems with the property about which they knew or

should have known. The Hermansens are not contending that they are owed a duty as third-party intended beneficiaries. They do not assert that Terena and Tasulis owed them duties arising from a contract to which they are not privy. We therefore distinguish the case at bar from *American Towers* and *SME Industries* as we are not faced with third-party beneficiaries or a suit by a buyer against a seller where all respective rights of the parties are negotiated and risk appropriately designated in a written instrument. The relationship at issue is a direct relationship between buyers, a real estate broker, and his agent who allegedly failed to properly discharge their professional duties.

¶ 15 The facts of *American Towers*, and two court of appeals cases that predate it, *Maack v. Resource Design & Construction, Inc.*, 875 P.2d 570 (Utah Ct.App.1994), and *Schafir v. Harrigan*, 879 P.2d 1384 (Utah Ct.App.1994), all involved the purchase of completed residences. In those cases, plaintiffs sought economic damages resulting from faulty construction. In the instant case, the Hermansens purchased a lot and entered a contract for the construction of a home. They contend that the economic damages they seek relate to the manner in which the real estate broker and his agent provided services to them and are, therefore, consistent with *American Towers, SME Industries, Maack,* and *Schafir.* Conversely, an opinion that economic losses cannot be recovered under any circumstance runs afoul of previous precedent and, indeed, ignores the precedents relied upon in *American Towers.*

██ ██ ██ ██ ██
██ ██ ██ ██ ██ Colorado cases wherein the Supreme Court of Colorado adopted the economic loss rule, but allowed causes of action to lie for breaches of duties arising outside of written contracts. *Grynberg v. Agric. Tech, Inc.*, 10 P.3d 1267 (Colo.2000); *Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256 (Colo.2000). Expressly adopting the economic loss rule, the Supreme Court of Colorado outlined the practical application and parameter of the rule, stating:

> The proper focus in an analysis under the economic loss rule is on the source of the duties alleged to have been breached.

Thus, our formulation of the economic loss rule is that a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach *absent an independent duty of care* under tort law. *Grynberg*, 10 P.3d at 1269 (emphasis added).

██ ¶ 17 We expressly adopt this interpretation of the economic loss rule. Therefore, the initial inquiry in cases where the line between contract and tort blurs is whether a duty exists independent of any contractual obligations between the parties. When an independent duty exists, the economic loss rule does not bar a tort claim "because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule." *Town of Alma*, 10 P.3d at 1263. We now turn to an analysis of whether defendants owed the Hermansens any independent duties.

### III. BREACH OF DUTIES AS A LICENSED REAL ESTATE PROFESSIONALS

¶ 18 The Hermansens allege that Tasulis and Terena breached duties owed to them as licenced real estate professionals in not disclosing known material defects in the property. We discuss each alleged breach in turn.

¶ 19 The Hermansens assert that as a licensed real estate broker, Tasulis owed them a duty to disclose known material defects in the soil condition at the subdivision. As discussed above, if Tasulis owed an independent duty to the Hermansens, *American Towers* does not bar the Hermansens claim.

██ ¶ 20 In *Secor v. Knight*, we discussed the duties imposed upon real estate brokers to "deal fairly and honestly, despite the fact that the broker is acting primarily as the seller's agent." 716 P.2d 790, 795 n. 1 (Utah 1986) (citing Note, *Real Estate Brokers' Duties to Prospective Purchasers*, 1976 B.Y.U. L.Rev. 513, 514–15.) We cited with approval a California case that held that the purposes for imposing a duty to disclose accurate or complete information "are to protect the buyer from the unethical broker and seller and to insure that the buyer is provided sufficient accurate information to make an

informed decision whether to purchase." *Id.* (citing *Easton v. Strassburger,* 152 Cal. App.3d 90, 199 Cal.Rptr. 383 (1984)). Because of the potential of substantial injury that could result from misplaced reliance on a broker, the *Easton* court held:

> A real estate broker is a licensed person or entity who holds himself out to the public as having particular skills and knowledge in the real estate field. He is under a duty to disclose facts materially affecting the value or desirability of the property that are known to him. . . .

*Easton,* 199 Cal.Rptr. at 387. We conclude that Tasulis owed an independent duty to the Hermansens to disclose facts materially affecting the value or the desirability of the property that were known to him.

¶ 21 Similarly, the Hermansens allege that although Terena was selling property for McDougal Shaw Development, she owed a duty as a licensed real estate agent to disclose known soil defects. Terena's liability would flow to Tasulis as a result of the employer-employee relationship, which defendants have not challenged. In *Christenson v. Commonwealth Land Title Co.,* 666 P.2d 302 (Utah 1983), we stated that although gratuitous advice from a stranger to a transaction cannot be actionable, when or if

> "the information is given in the capacity of one in the business of supplying such information, that care and diligence should be exercised which is compatible with the particular business or profession involved. Those who deal with such persons do so because of the advantages which they expect to derive from this special competence. The law, therefore, may well predicate on such a relationship, the duty of care to insure the accuracy and validity of the information."

666 P.2d at 305 (quoting 1 F. Harper & F. James, *The Law of Torts,* § 7.6, at 546 (1956)).

¶ 22 Specific to the duties of a real estate agent to those persons to whom the agent owes no fiduciary duty, we stated in *Dugan v. Jones* that "[t]hough not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent and is answerable at law for his or her statutory duty to the public." 615 P.2d 1239, 1248 (Utah 1980). We apply this reasoning and hold that Terena as the real estate agent owed a duty, independent of any implied or express contracts, to be "honest, ethical, and competent" in her relationship with the Hermansens, although she and Tasulis were hired by the vendor. We agree with the assessment of the court of appeals in *Schafir v. Harrigan* when it stated:

> Oftentimes, . . . real estate agents and sellers are understandably unaware of latent defects in the home at the time of sale. This is an inherent risk involved in purchasing a home. Thus, the mere fact that the real estate agent has a duty to disclose known defects to potential purchasers does not mean that the [seller's] agent is liable for all subsequent problems that come to light. The purchasers must also demonstrate that the real estate agent misrepresented, or had prior knowledge of, defects in the home. Only when the purchaser can establish that the agent had both the duty to disclose and knowledge of the defects is recovery appropriate.

879 P.2d 1384, 1390 (Utah Ct.App.1994).

¶ 23 Accordingly, we do not impose upon real estate professionals a duty to conduct independent inspections of property they sell. However, when real estate professionals undertake to secret known material defects, they breach their duty to be honest, ethical, and competent and are liable for their actions.

## IV. FRAUD

¶ 24 Under a general heading of fraud, the Hermansens allege that the unstable nature of the soil and subsurface conditions of the lots upon which their home was built, known to Tasulis and Terena, was not disclosed to them. Fraudulent nondisclosure encapsules the cause of action claimed by the Hermansens.[3] To support a claim of fraudu-

---

3. The Hermansens also allude to intentional misrepresentation, but this claim is undeveloped, and we therefore decline to address it.

lent nondisclosure a plaintiff must prove the following three elements: (1) the nondisclosed information is material, (2) the nondisclosed information is known to the party failing to disclose, and (3) there is a legal duty to communicate. *Mitchell v. Christensen,* 2001 UT 80, ¶ 9, 31 P.3d 572.

¶ 25 In *Mitchell,* the plaintiffs alleged that at the time of their purchase of the defendants' home (1) a swimming pool on the property was leaking, (2) the defendants were aware of the leak, and (3) the defendants had a legal duty to disclose these defects prior to selling their property to the plaintiffs, which they failed to do. 2001 UT 80 at ¶ 4, 31 P.3d 572. The defendants defended that they had no duty to disclose defects under the doctrine of caveat emptor. *Id.* at ¶ 5, 31 P.3d 572. We held that sellers of real property owe a duty to disclose material known defects that cannot be discovered by a reasonable inspection by an ordinary prudent buyer. *Id.* at ¶ 12, 31 P.3d 572.

¶ 26 With this holding, we issued some specific precautions. We first cautioned that "if a defect can be discovered by reasonable care, the doctrine of caveat emptor prevails and precludes recovery by the vendee." *Id.* at ¶ 11, 31 P.3d 572. We next instructed that an ordinary prudent buyer would not be required to "hire numerous expert home inspectors to search for hidden defects," but this does not mean that inspection by an expert will never be required. *Id.* at ¶¶ 12–13, 31 P.3d 572. We concluded in *Mitchell* that the sellers had a legal duty to disclose the known leaks in their swimming pool prior to the sale of their property to the buyers because the leaks could not have been discovered by an ordinary prudent buyer.[4] *Id.* at ¶ 16, 31 P.3d 572.

¶ 27 Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Surety Underwriters,* 2000 UT 71 at ¶ 14, 10 P.3d 338 (citations omitted). With this standard in mind, we review the elements of fraudulent nondisclosure.

¶ 28 First, we must determine whether the defective nature of the property was material. Second, we evaluate whether the nondisclosed information was known to the party failing to disclose. Third, we must decide whether there was a legal duty to communicate. Having already held that both Terena and Tasulis owed a duty to disclose any known defects, we address only the first two elements.

¶ 29 We must determine whether the defective condition of the property was material. We have held that materiality is " 'something which a buyer or seller of ordinary intelligence and prudence would think to be of some importance in determining whether to buy or sell.' " *Gohler v. Wood,* 919 P.2d 561, 564 (Utah 1996) (quoting *S & F Supply Co. v. Hunter,* 527 P.2d 217, 221 (Utah 1974)). It is clear to us that the defect in the property that caused substantial damage to the home, as occurred in this case, is a defect that a buyer or seller of ordinary intelligence and prudence "would think to be of some importance" in determining whether to buy a home. *Id.*

¶ 30 The remaining issue is whether Terena and Tasulis knew of the material defect in the property. In support of their contention that Terena and Tasulis knew of the defect, the Hermansens assert that both of them worked out of a trailer on the subdivision. Tasulis knew of the subdrainage system. It is disputed whether he had actual knowledge of the unstable condition of the soil, but there is testimony that he heard statements regarding the backhoe being severely stuck in mud near where the Hermansens' home would be built. We agree with the Hermansens that disputed facts sufficient to preclude summary judgment remain as to whether Tasulis did or did not know of the unstable condition of the soil.

---

4. We recognize that in the instant case the buyers were not dealing directly with the sellers. This difference does not insulate a real estate agent from the tort of fraudulent nondisclosure because we have determined above that real estate agents owe a duty to buyers to be honest, ethical, and competent.

¶ 31 Terena was guarantor on the loan for the purchase of the property that was developed into the Wasatch Downs Subdivision. Her husband was aware of the backhoe becoming stuck and was also aware of livestock miring down in the area near the Hermansens' future home. Terena knew of the subdrainage system and occupied a trailer on the subdivision. We recognize that " '[b]ald statements do not suffice to establish a genuine issue of material fact.' " *Rawson v. Conover*, 2001 UT 24, ¶ 33, 20 P.3d 876, 883 (quoting *Dairy Prod. Servs., Inc. v. Wellsville*, 2000 UT 81, ¶ 24, 13 P.3d 581 (quoting *In re Smith*, 925 P.2d 169, 174 (Utah 1996))). However, in responding to Terena and Tasulis' motion for summary judgment, the Hermansens were required to "set forth specific facts showing that there [was] a genuine issue for trial." Utah R. Civ. P. 56(e); *see also Rawson*, 2001 UT 24, ¶ 33, 20 P.3d 876. The Hermansens contend that facts and inferences drawn in the light most favorable to them should preclude summary judgment for Terena. We agree and hold that sufficient facts, as discussed above, exist to preclude summary judgment for her.

## V. SPOUSAL PRIVILEGE

¶ 32 The Hermansens assert that evidence supporting their claim of Terena's knowledge of the unstable condition of the soil at the subdivision could be obtained from testimony of communications between Terena and Stanley. Following advice from their counsel, Terena and Stanley refused to answer questions in their depositions regarding discussions they may have had about the soil conditions, asserting spousal privilege. The Hermansens argue that the privilege should not preclude discovery in this instance because the communication between Stanley and Terena was used to commit, plan to commit, or conceal a tort.

¶ 33 Under Utah law, "neither a wife nor a husband may either during a marriage or afterwards be, without the consent of the other, examined as to any communication made by one to the other during the marriage." Utah Code Ann. § 78–24–8(1)(a) (1996). The privilege does not apply to (1) a civil action or proceeding by one spouse against the other, (2) a criminal action or proceeding for a crime committed by one spouse against another, (3) the crime of deserting or neglecting to support a spouse or child, or (4) any civil or criminal proceeding for abuse or neglect committed against the child of either spouse. *Id.* § 78–24–8(1)(b)(i)(iv). Under the fifth exception, the privilege does not apply "if otherwise specifically provided by law." *Id.* § 78–24–8(v). The question then becomes whether there are any other laws which grant exceptions to spousal privilege.

¶ 34 The purpose of the communications privilege is, "to encourage marital confidences, which in turn promotes marital harmony." Utah R. Evid. 502, advisory committee note (2001). With respect to the privilege, the advisory committee on the Utah Rules of Evidence has noted:

> More persuasive [is] . . . the interest in securing an expectation of privacy pertaining to confidential communications between spouses. This expectation interest is based in part on whatever reliance married couples have placed on their understanding of existing marital privilege law. It is based well on the private nature of the marriage relationship.

*Id.* Furthermore, it has been said, "[T]he stress of modern society make more attractive than ever before the prospect of a safe harbor of intimacy where spouses can confide in each other freely without fear that what they say will be published under compulsion." *Id.* (quoting 2 J. Weinstein & M. Berger, *Weinstein's Evidence* 505–12 (1986)).

¶ 35 The Hermansens rely upon the exception found in rule 502(b)(4)(B) of the Utah Rules of Evidence, which states that the privilege does not exist "[a]s to any communication which was made in whole or in part, to enable or aid anyone (i) to commit, (ii) to plan to commit, or (iii) to conceal a crime or tort." Utah R. Evid. 502(b)(4)(B)(i)-(iii). However, a simple allegation of claims sounding in tort does not render this exception applicable.

¶ 36 The advisory committee note to rule 502 recognizes that the exceptions to the rules are similar to those found in rule 28 of

the 1971 Utah Rules of Evidence. Rule 28(2)(e)(1971), stated that the privilege is not applicable, "if the judge finds that sufficient evidence, aside from the communication, has been introduced to warrant a finding that the communication was made, in whole or in part, to enable or aid anyone to commit or to plan to commit a tort." Utah R. Evid. 28(2)(e). This language gives guidance in determining when a tort exception to spousal privilege should apply. To preserve the purpose of the privilege, it cannot be found to be inapplicable simply because a party alleges a tort or crime. There must be sufficient evidence, independent of the communication, to support a finding that it was so made.

¶ 37 In the instant case, the trial court determined that only speculation supported the Hermansens' claims against Tasulis and Terena. We now review the record to determine whether there was evidence, independent of any communication, to support a finding that communication from Stanley to Terena was made in whole or in part to enable or aid her to plan to commit or to conceal a tort. The Hermansens adduced evidence that Stanley saw a seep and surface water prior to his purchase of the subdivision property and subsequently installed a subdrainage system. Terena and Tasulis occupied a trailer on the subdivision during the construction project. The trailer was located at the site during the period of time when a backhoe was stuck in the soil which had the consistency of "chocolate pudding." The Hermansens produced evidence that Tasulis and Terena were aware of the installation of a subdrainage system to remove ground water. A large percentage of the real estate sold by Terena was properties Stanley or his businesses owned. Terena was also a guarantor on the purchase of the property. A reasonable inference can properly be drawn that Terena would have inspected the property and made some inquiries about its suitability before becoming a guarantor. *See Surety Underwriters,* 2001 UT at ¶ 15, 10 P.3d 338 ("[W]e view the facts and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party.") Both Stanley, as a developer of the property, and Terena, as the real estate agent, had a pecuniary interest in selling the property.

We hold that this independent evidence is substantial and sufficient to warrant an exception to the spousal communication privilege. We realize the stringent nature of this exception and the importance of the policy enunciated above for the existence of the privilege. To the extent that their communications with respect to the Wasatch Downs Subdivision were shared for the purpose of aiding one another in planning, committing, or concealing tortious acts, they should not be privileged. We therefore hold that the facts stated above are sufficient to justify an exception to the privilege in this instance.

## CONCLUSION

¶ 38 We reverse the trial court's order of summary judgment in favor of Tasulis and Terena. We remand the case for further proceedings consistent with this opinion.

¶ 39 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice RUSSON, and Justice WILKINS concur in Justice HOWE'S opinion.